NOT DESIGNATED FOR PUBLICATION

No. 118,710

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASMON DEVAR WATSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed August 2, 2019.
Affirmed in part and vacated in part.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Rachel L. Pickering*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., STANDRIDGE, J., and NEIL B. FOTH, District Judge, assigned.

PER CURIAM:  Following a jury trial, Jasmon Devar Watson was convicted of making a false claim to the Medicaid program. As a result of his conviction, the district court ordered Watson to pay $13,077.22 in restitution. Watson appeals from both his conviction and the order of restitution. For the reasons stated below, we affirm Watson's conviction but vacate the district court's order of restitution.

1

During the time period from March 2011 to July 2015, Watson worked two part-time jobs in Kansas City, Kansas. First, he was employed as a transitional living skills assistant with Best Choice Home Health Care Agency. In this position, Watson provided life activity training and services to patients with traumatic brain injuries. Watson's employer, Best Choice, contracted with Medicaid to pay its employees for these services. In addition to his job at Best Choice, Watson also worked part-time as a store clerk for QuikTrip.

After being alerted of the possibility that Watson's work times in these two jobs overlapped, Special Agent Darren Brown in the Medicaid Fraud and Abuse Division of the Kansas Attorney General's Office launched an investigation into possible Medicaid fraud. As part of the investigation, Agent Brown requested Watson's personnel records and client documentation from both Best Choice and QuikTrip.

Cindy Ludwig, an analyst in the Kansas Attorney General's Office, used the records and documentation received by Agent Brown to create a table that identified overlapping time between the hours Watson spent working at QuikTrip and the hours he spent providing services to Medicaid beneficiaries through Best Choice. This table established 247 instances of overlapping time from January 1, 2013, to July 31, 2014. Based on the number of overlapping hours, the number of overlapping units, and the applicable unit rate, Ludwig calculated that Watson was paid $13,077.22 for hours he reported spending with a Medicaid beneficiary when he was actually working those hours at QuikTrip.

On July 6, 2015, the State charged Watson with one count of making a false claim to the Medicaid program and one count of felony theft. The matter proceeded to trial, where the State presented four witnesses:  Kim Reynolds, a traumatic brain injury

program manager for the Kansas Department for Aging and Disability Services; Special Agent Brown; Corey Hanover, Watson's QuikTrip Manager; and Ludwig. In addition to testimony from these witnesses, the State introduced several exhibits into evidence, including Ludwig's table showing the overlapping hours, Watson's personnel records, and other documentation from QuikTrip and Best Choice.

Watson testified on his own behalf and did not deny that his Best Choice and QuikTrip hours overlapped. Instead, he claimed that he worked his Best Choice hours around his QuikTrip schedule. Watson insisted he always worked the total number of hours documented on his Best Choice time sheet but not necessarily at the times noted. Watson explained that the reason he submitted inaccurate time sheets was because it was time-consuming to keep changing the Best Choice schedule to reflect the hours he actually worked. Watson repeatedly stated throughout his testimony that his supervisors at Best Choice were aware of what he was doing and told him to continue working in this manner. On cross-examination, however, Watson acknowledged that every time sheet he submitted to Best Choice contained a warning that "'[a]ny misrepresentation or falsification will result in Medicaid fraud and will be punishable to the full extent of the law.'"

Following Watson's testimony, the defense rested and a jury instruction conference was held. Watson objected to jury instruction 10 which stated:

"It is not a defense that others who participated in the commission of the crime have or have not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same act."

Watson's objection was overruled, and the remaining instructions were approved by all parties. The jury ultimately found Watson guilty of making a false claim to the Medicaid program but was unable to reach a verdict on the charge of theft.

3

Before sentencing, Watson filed a motion for a new trial in which he reiterated his objection to jury instruction 10. The motion was denied. The court ultimately sentenced Watson to an underlying term of five months in prison but granted Watson probation for a term of 12 months.

The court also took up the issue of restitution at sentencing. The State requested Watson pay $13,077.22 in restitution. Watson argued against restitution, again insisting that he worked every hour billed to Medicaid, which meant no restitution was owed. The district court was not persuaded by Watson's argument and ordered Watson to pay the full $13,077.22 in restitution.

ANALYSIS

On appeal, Watson argues (1) the State committed prosecutorial error during its closing argument; (2) the district court erred by overruling his objection to the jury instructions; (3) cumulative errors denied him a fair trial; and (4) the district court erred by ordering him to pay restitution.

1. *Prosecutorial error*

We consider claims of prosecutorial error in two steps. First, we look to see whether the prosecutor erred. Second, if there was an error, we must decide whether that error prejudiced the defendant's right to a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

a. *Error*

Watson claims the State committed three acts of prosecutorial error during closing argument:  (1) The State improperly shifted the burden of proof onto him, (2) the State

4

misstated the law regarding Medicaid fraud, and (3) the State misstated the evidence. We address each of Watson's claims of error in turn.

(1) *Burden shifting*

Watson claims the State committed prosecutorial error by improperly shifting the burden of proof to him during its closing argument. Burden shifting is when the prosecutor's comments shift the burden to the defendant to prove his or her innocence. "Kansas courts deem it 'improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof.'" *State v. Duong*, 292 Kan. 824, 832, 257 P.3d 309 (2011) (quoting *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 [2010]).

To support his claim that the prosecutor's comments shifted the burden to him to prove his innocence, Watson points to the prosecutor's repeated comments to the jury that he failed to provide evidence in support of his testimony that he worked the hours billed to the Medicaid beneficiaries but just did not work those hours at the time listed on his time sheet. Watson argues the prosecutor's remarks went beyond the wide latitude granted prosecutors to comment on the evidence and improperly shifted the burden of proof to him. We disagree.

Prosecutors are granted wide latitude to address the arguments and weaknesses of the defense. *Duong*, 292 Kan. at 832. To that end, a prosecutor's comments must be evaluated within the context in which they are made. *State v. Crosby*, 293 Kan. 121, 136-37, 262 P.3d 285 (2011). Indeed, Kansas courts routinely hold that "a prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case." *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014); see also *State v. Wilson*, 295 Kan. 605, 623-25, 289 P.3d 1082 (2012) (prosecutor's comments on efficacy of defendant's defense and lack

5

of evidence supporting defendant's version of events did not improperly shift burden of proof to defendant); *Crosby*, 293 Kan. at 135-37 (prosecutor's general comments regarding defendant's failure to dispute witness' testimony did not constitute improper burden shifting); *Duong*, 292 Kan. at 832-33 ("The prosecutor did not . . . call upon the defense to disprove the occurrence of a crime; the prosecutor only pointed out that the evidence supporting the defense theory of the case was thin.").

When taken in context, we find the prosecutor's arguments are within the wide latitude afforded a prosecutor to address the facts of the case and the weaknesses of the theory of defense offered. In order to better understand the context in which the arguments were made, we have italicized the prosecutor's statement of facts and underlined the prosecutor's argument based on those facts:

> *"He admitted he didn't always work those hours that he put down on his time sheets. He also indicated and talked a great deal about the case notes. Those case notes, he admitted, were submitted at the same time as the time sheets. There's no additional information in those case notes according to him that would give any other times or dates. He's asking you to believe that he provided those services at some other time*, but he has provided no information, no proof, no evidence of when he provided those services.
> . . . .
> "*You also heard the testimony of Darren Brown, and he provided he was the one who issued all the subpoenas and gathered up all of this information. And I admit this case is mostly records, but all of these exhibits, this is the evidence that we have*. Mr. Watson can't provide any other written documentation of when and how and if he provided services to these traumatic brain injured people. *He testified how important those services were to them, made a world of difference or should have made a world of difference to them. That's the purpose of the program, it's to help them get out and get a job and have all the things everyone would like to have*. But if they weren't getting those services or they weren't getting them at the times he said, how do we even know that [they] got those services—that they got to receive them. There's nothing in the record that

would indicate that during those times when he had these overlaps that he could somehow magically work two places at once.

. . . .

"*He agrees that those hours are false. He claims that he provided services and that he was not allowed to change his time sheets. He also claims that he couldn't or didn't actually provide any testimony about whether or not he could change his hours at QuikTrip other than saying that they were very flexible so he could have done that at the very least.* He's provided no evidence that he has provided or attempted to provide or could have provided services during those periods while he was working at QuikTrip and that he reported he was working for these clients."

And on rebuttal:

"*And it's also his statements that he was working with a very vulnerable population that couldn't tell time. He knew that. He knew they needed care, that's why he was there. He was the service transitional living service coordinator. They relied on him to make sure that they got the services they deserved and the State relied on him. That was the purpose of that program, to provide those services. Provide those services and provide proof that he actually did it is why we're here today.* And has he provided any proof that he actually provided those services? No. *All he's done is submit time sheets that 247 times overlapped with times that he was working at QuikTrip. That's our contention. That's what we're asking you to find.* . . .

"*The record is clear, and he's even admitted that each time he signed one of these time sheets he was aware of the statement any misrepresentation or falsification will result in Medicaid fraud and will be punishable to the full extent of the law. How many times does an individual commit a crime and have a warning each time they do it? In these cases, they do. Each time he signed off on one of these time sheets he was told don't put down false information, it could impact you, it could subject you to Medicaid fraud charges and yet he signed them, he submitted them, he attached the case notes to them.*

"*And counsel wants to say there's no evidence here. State has presented plenty of evidence.* The defendant has not. *Thank you.*"

As the excerpts above show, the prosecutor did not improperly shift the burden of proof to Watson. When taken in context, the prosecutor highlighted excerpts from Watson's testimony and then commented on the absence of evidence to rebut the State's case. And, in a case like this where the jury has been properly instructed that the prosecution has the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence. *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006).

Based on the discussion above, we find the prosecutor's comments came within the wide latitude allowed in discussing evidence. See *State v. Peppers*, 294 Kan. 377, 397-98, 276 P.3d 148 (2012) ("When a prosecutor's comment 'constitute[s] only a general question about the absence of evidence to rebut the State's witnesses . . . [and] not an impermissible remark about the defendant's failure to testify or an attempt to shift the burden of proof to the defense,' the comment is within the wide latitude afforded to the prosecution."). As such, we conclude the prosecutor did not commit error related to the burden of proof.

### (2) *Misstatement of law*

Watson argues the State committed prosecutorial error by misstating the law regarding Medicaid fraud. As noted above, prosecutors are granted wide latitude to argue the State's case and attempt to obtain a conviction. See *Sherman*, 305 Kan. at 109. But if a defendant can demonstrate that a prosecutor misstated the law, "then they have satisfied the first step of the prosecutorial error test because [the Kansas] Supreme Court has held that misstatements of law fall outside of the wide latitude afforded prosecutors, constituting error." *State v. Taylor*, 54 Kan. App. 2d 394, 404-05, 401 P.3d 632 (2017); see *State v. Phillips*, 299 Kan. 479, 504-05, 325 P.3d 1095 (2014).

In this case, Watson was charged with one count of making a false claim to the Medicaid program (i.e., Medicaid fraud). Medicaid fraud is defined as:

"(1) With intent to defraud, making, presenting, submitting, offering or causing to be made, presented, submitted or offered:

. . . .

"(B) any false or fraudulent statement or representation for use in determining payments which may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable." K.S.A. 2018 Supp. 21-5927(a)(1)(B).

A person acts with an intent to defraud if they intend "to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property." K.S.A. 2018 Supp. 21-5111(o). In order to obtain a conviction against Watson for making a false claim to the Medicaid program, the State was required to show that Watson intended to deceive Medicaid when he submitted his inaccurate time sheets to Best Choice. See K.S.A. 2018 Supp. 21-5111(o); K.S.A. 2018 Supp. 21-5927(a)(1)(B).

Watson argues the State misstated this legal standard by pointing out the warnings on each time sheet and arguing that every "time [Watson] signed off on one of these time sheets he was told don't put down false information, it could impact you, it could subject you to Medicaid fraud charges and yet he signed them." Watson claims that the State's argument ignores the "intent to defraud" element and instead implies that simply signing off on the inaccurate time sheets was enough to constitute a crime. We are not persuaded by Watson's argument. The State did not, as Watson suggests, imply that simply signing off on the inaccurate time sheets was enough to satisfy the elements of the crime. Rather the State highlighted the fact that each of the time sheets Watson submitted contained a warning against making misrepresentations or falsifications and invited the jury to infer from these facts that Watson knew what he was doing and acted with an intent to deceive and defraud each of the 247 times that he submitted an inaccurate time sheet. See *State v.*

9

*McWilliams*, 295 Kan. 92, 96-97, 283 P.3d 187 (2012) (when evidence indicates that defendant was aware of and understood his or her responsibilities and duties under Medicaid program, finder of fact may infer that he or she intentionally acted to defraud Medicaid program when he or she submitted false claims for payment). We find no error with respect to the prosecutor's comment at issue.

### (3) *Misstatement of evidence*

Finally, Watson argues the State committed prosecutorial error by misstating the evidence during its closing argument:

> "He admits that he put false hours on *and he can't provide and has not provided <u>any</u> proof that he actually provided any services during that day that he charged for*. It's not in the case notes because those case notes were attached to each one of these time sheets and submitted. It was proof that went with these time sheets." (Emphasis added.)

Although prosecutors are afforded wide latitude to argue the State's case during closing argument, a prosecutor commits error when he or she misstates the evidence, "even when the misstatement is accidental or inadvertent." *State v. Sturgis*, 307 Kan. 565, 570, 412 P.3d 997 (2018). We agree with Watson that the prosecutor committed error by misstating the facts to the jury. By arguing Watson did not provide *any* proof that he provided services to the Medicaid beneficiaries (at any point) during the day on which Watson documented his hours worked, the prosecutor expressly ignored the fact that Watson himself testified that he worked all of the hours that he claimed in any given day, just not at the time of the hours documented on the time sheet. Watson's testimony is evidence. By expressly stating to the jury in closing argument that there was no evidence on this issue, the prosecutor erred.

10

b. *Prejudice*

Because we have determined the prosecutor erred by misstating the facts to the jury, we now move on to the prejudice step of the analysis and apply the constitutional harmlessness test. See *Sherman*, 305 Kan. at 109. As noted above, prosecutorial error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

The State argues that even if the prosecutor misstated the evidence during closing argument, any error was harmless. Specifically, the State argues that the jury was properly instructed to disregard any statements that were not supported by the evidence and that the statements, arguments, and remarks of counsel, while intended to help them understand the evidence and apply the law, were not evidence themselves. See *McKinney*, 272 Kan. at 346 (where jury has been properly instructed that prosecution has burden of proof, prosecutor may argue inferences based on balance or lack of evidence). As noted by the State, the jury was instructed on multiple occasions to disregard any statements that were not supported by the evidence. We presume the jury followed them. This presumption serves to mitigate any damage caused by the prosecutor's comments. See *State v. Kettler*, 299 Kan. 448, 478, 325 P.3d 1075 (2014).

More importantly, however, is the fact that the prosecutor's misstatement of fact did not bear on the factual issue to be decided by the jury. The jury was charged with deciding whether Watson submitted inaccurate Medicaid time sheets to Best Choice. Even if the jury had believed Watson's testimony that he worked all of the hours documented in his submission on each given day, just not at the times documented on the time sheet, his inaccurate submission still meets the elements of Medicaid fraud as charged. In fact, it appears that at least some members of the jury *did* believe Watson's

11

testimony that he actually worked the hours at a different time because the jury ultimately could not come to a consensus on the theft charge, which the State ultimately dismissed.

Based on the record before us, we find the State successfully demonstrated beyond a reasonable doubt that its isolated error in misstating the evidence during closing argument did not affect the outcome of the trial; in other words, we find no reasonable possibility that the State's error contributed to the verdict. See *State v. Lower*y, 308 Kan. 1183, 1211-12, 427 P.3d 865 (2018); *Sturgis*, 307 Kan. at 570.

2. *Jury instruction 10*

Watson claims the district court erred by overruling his objection to a jury instruction on a defendant's responsibility for a crime of another who is not prosecuted.

The standard of review for jury instruction issues on appeal is well known:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

At the first step, there is no dispute that Watson properly preserved this issue for appellate review by lodging a timely and appropriate objection before the district court. Because he properly preserved the issue, this court may reverse the district court's decision to overrule the objection if giving the instruction was an error and if we

12

determine there is a reasonable probability that the error affected the outcome of the trial given the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

At the second and third step, this court determines if the district court's decision to give the instruction was error by deciding whether the instruction was both legally and factually appropriate. *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018) (citing *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 [2016]). This court exercises unlimited review to determine whether the instruction was legally appropriate. *Johnson*, 304 Kan. at 931. A legally appropriate instruction must fairly and accurately state the applicable law. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). This court then determines whether the instruction was factually appropriate by considering the evidence in the light most favorable to the defendant. *Johnson*, 304 Kan. at 931.

a. *Error*

The instruction at issue was taken directly from the language contained in PIK Crim. 4th 52.150 (2016 Supp.) and provided:

> "It is not a defense that others who participated in the commission of the crime have or have not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same act."

(1) *Legally appropriate*

To be legally appropriate, a jury "instruction must fairly and accurately state the applicable law." *Plummer*, 295 Kan. at 161. As noted above, the language of jury instruction 10 was taken, almost verbatim, from PIK Crim. 4th 52.150 (2016 Supp.). As statutory authority for this pattern instruction, the committee's Notes on Use relies on K.S.A. 2018 Supp. 21-5210(c), which provides:

"(c) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime:

    (1) Lacked criminal or legal capacity;

    (2) has not been convicted;

    (3) has been acquitted; or

    (4) has been convicted of some other degree of the crime or of some other crime based on the same act."

Watson does not argue that jury instruction 10's almost verbatim recitation of PIK Crim. 4th 52.150 (2016 Supp.) is a misstatement of K.S.A. 2018 Supp. 21-5210(c). Because jury instruction 10 fairly and accurately states the applicable law, we find it legally appropriate. See *Plummer*, 295 Kan. at 161.

### (2) *Factually appropriate*

To be factually appropriate, there must be sufficient evidence, when viewed in the light most favorable to the requesting party, to support giving the instruction. *Johnson*, 304 Kan. at 931. As noted above, jury instruction 10 was requested by the State and given over Watson's objection. Accordingly, we must determine whether, when viewed in the light most favorable to the State, there was sufficient evidence to support giving jury instruction 10.

Watson claims jury instruction 10 was not factually appropriate because he did not affirmatively introduce Best Choice's involvement as a defense; instead, he simply denied that a crime was committed at all. But Watson testified multiple times that Best Choice knew about his QuikTrip schedule and knew that it conflicted with his schedule at Best Choice. Watson further testified that Best Choice was never "in the dark" about what was going on. And, although the State objected to the question, Watson's counsel elicited testimony from Agent Brown that Best Choice recently was in some kind of trouble and

14

had a $1.8 million federal judgment levied against it. Combined, these facts create a reasonable inference for the jury that Watson simply was doing as he was told when he submitted the inaccurate time sheets and Best Choice, not Watson, was really the party responsible for making the false or fraudulent representations to Medicaid.

Watson also argues that jury instruction 10 was not factually appropriate because, in charging him with Medicaid fraud, the State did not allege that Best Choice, or any other party, committed Medicaid fraud but (1) lacked criminal or legal capacity to commit Medicaid fraud, (2) had not been convicted of Medicaid fraud; (3) had been acquitted of Medicaid fraud; or (4) had been convicted of some other degree of the Medicaid fraud or of some other crime based on the same act. See K.S.A. 2018 Supp. 21-5210(c).

In *State v. Beard*, 273 Kan. 789, 808-10, 46 P.3d 1185 (2002), our Supreme Court held that PIK Crim. 3d 54.07, the predecessor to PIK Crim. 4th 52.150, was factually appropriate when specific evidence adduced that a person not charged with the crime may have been involved. Applying the legal standard set forth in *Beard*, our review of the record establishes that the State failed to present "specific evidence" at trial that Best Choice had not been convicted of Medicaid fraud, had been acquitted of Medicaid fraud, or had been convicted of some other crime based on the facts presented at trial to support a Medicaid fraud conviction against Watson. See also *State v. Oduol*, No. 97,239, 2009 WL 743047, at *4-5 (Kan. App. 2009) (unpublished opinion) (holding that instruction based on PIK Crim. 3d 54.07 may be unnecessary when there is no evidence indicating whether co-conspirator has or has not been convicted of crime); *State v. Adams*, No. 109,925, 2014 WL 2871340, at *2-3 (Kan. App. 2014) (unpublished opinion) (citing *Oduol* and holding that instruction based on PIK Crim. 4th 52.150 is unnecessary when there is no evidence that defendant's co-conspirator was prosecuted for his involvement in the crime). Even when viewing the facts in a light most favorable to the State, we find

15

insufficient evidence to support the district court's decision to give jury instruction 10. See *Johnson*, 304 Kan. at 931.

b. *Harmless error*

Having determined that jury instruction 10 was not factually appropriate, and therefore given in error, we now must decide whether the error requires reversal, i.e., whether the error can be deemed harmless. See *McLinn*, 307 Kan. at 317. An error is deemed harmless when, in light of the entire record, there is no reasonable probability that the error affected the outcome of the trial. *Plummer*, 295 Kan. at 168. To that end, Watson argues that the instruction improperly suggested to the jury that a crime had been committed and that "Watson was working with Best Choice to perpetuate a fraud." But Watson's argument disregards the fact that, during his trial testimony, Watson himself readily admitted to the jury that he submitted inaccurate time sheets to Best Choice, and by extension Medicaid, on 247 separate occasions, which satisfies the elements of the crime charged. Further, as the panel of our court noted in *Adams*, jury instruction 10 at most suggested to the jury that Best Choice had not been convicted of Medicaid fraud, had been acquitted of Medicaid fraud, or had been convicted of some other crime based on the facts presented at trial to support a Medicaid fraud conviction against Watson. See *Adams*, 2014 WL 2871340, at *3. Even if the jury was persuaded by this suggestion, that fact has no bearing on and is irrelevant to the jury's determination of whether the State proved Watson guilty beyond a reasonable doubt.

Although the district court erred in giving jury instruction 10 because it was factually improper, we conclude that error was harmless because, in light of the entire record, there is no reasonable probability that giving it affected the outcome of the trial.

16

3. *Cumulative error*

Third, Watson argues that the prosecutorial error in misstating the evidence and the jury instruction error collectively denied him his right to a fair trial, even if neither was egregious enough, standing alone, to warrant reversal. When a defendant raises a cumulative errors issue, the test is whether the totality of the circumstances establish that the defendant was substantially prejudiced by the cumulative errors and was therefore denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors within the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014); see *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016). If, as in this case, any of the errors being aggregated are constitutional in nature, then their cumulative effect must be harmless beyond a reasonable doubt. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014). "But if there is no error or only a single error, cumulative error does not supply a basis for reversal." *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017).

Here, Watson argues that the aggregate impact of the prosecutorial and jury instruction errors require a new trial. We disagree. At its core, the factual issue presented for the jury to decide was whether Watson submitted inaccurate Medicaid time sheets to Best Choice. Despite the fact that the State suggested to the jury that Watson's testimony did not count as evidence and that jury instruction 10 referring to uncharged actors was not supported by the facts, Watson repeatedly admitted during his testimony that he submitted inaccurate time sheets with overlapping hours to Best Choice, and by extension to Medicaid, on 247 separate occasions. This admission alone supports the jury's conviction of Medicaid fraud as charged. Considering the totality of the circumstances within the context of the entire record, the nature and number of the errors and their interrelationship, and the overall strength of the undisputed evidence, we find the two

errors—even when considered together—did not substantially prejudice Watson or deprive him of right to a fair trial; thus, the cumulative effect of the errors was harmless beyond a reasonable doubt. *Santos-Vega*, 299 Kan. at 27-28.

4. *Restitution*

At sentencing, the court ordered Watson to pay $13,077.22 in restitution. On appeal, Watson argues there is insufficient evidence in the record to support the court's order of restitution.

> "'Issues regarding the amount of restitution and the manner in which it is made to the aggrieved party are normally subject to review under an abuse of discretion standard. A district judge's factual findings underlying the causal link between the crime and the victim's loss are subject to a substantial competent evidence standard of review. And this court has unlimited review over interpretation of statutes.' [Citations omitted.]" *State v. Martin*, 308 Kan. 1343, 1349-50, 429 P.3d 896 (2018).

"'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). In reviewing for substantial competent evidence, "the appellate court does not reweigh the evidence or assess the credibility of witnesses." *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019).

As a general rule, K.S.A. 2018 Supp. 21-6604(b)(1) requires a district court to base restitution on the damage or loss caused by the defendant's crime. In cases of Medicaid fraud, however, a more specific statute on restitution controls. The relevant subsection of that statute provides that "any person convicted of a violation of the Kansas medicaid fraud control act may be liable for . . . [p]ayment of full restitution of the amount of the excess payments." K.S.A. 2018 Supp. 21-5933(a)(1).

18

Relying solely on K.S.A. 2018 Supp. 21-5933(a)(1), the State requested Watson to pay $13,077.22 in restitution. In support of its request, the State referenced the table introduced at trial that identified 247 instances of overlapping time between the hours Watson spent working at QuikTrip and the hours he spent providing services to Medicaid beneficiaries through Best Choice. Based on the number of overlapping hours, the State argued Watson was paid $13,077.22 for hours he reported spending with a Medicaid beneficiary when he was actually working those hours at QuikTrip.

In opposing the State's request for restitution, Watson argued the State failed to provide any evidence he received payment in excess of what he earned for the hours he actually worked. The court ultimately ordered restitution

> "in the amount requested by the State of $13,077.22. *The Court finds that the rule in these cases are that restitution should be ordered and it should be an exception not to order the restitution in the case*.
>
> "I certainly understand the arguments of both counsel in the matter, but statutorily and case law would indicate that payment of restitution is appropriate under the circumstances." (Emphasis added.)

As a preliminary matter, the language of the district court set forth in italics above is applicable in cases where restitution is ordered under the general restitution statute, K.S.A. 2018 Supp. 21-6604. See *State v. Alcala*, 301 Kan. 832, 840, 348 P.3d 570 (2015) (stating restitution is rule under K.S.A. 21-6604 and finding that restitution is unworkable should be exception). Thus, the district court's only stated justification for ordering restitution in this case was its conclusory finding that the statute and case law indicate restitution would be appropriate under the circumstances. But the statute of conviction here is K.S.A. 2018 Supp. 21-5927(a)(1)(B). This means that the jury found the State met its burden to prove that Watson unlawfully made a "false or fraudulent statement or representation for use in determining payments which may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable" with the

19

intent to defraud. Significantly, the State's burden in securing this conviction did not require proof that Watson received from Medicaid any money in excess of what he actually earned. In other words, an offender can be convicted of violating section (a)(1)(B) without any proof that the offender received an excess payment.

At sentencing, the State had the burden to present sufficient evidence to justify the amount of restitution sought. See *State v. Hall*, 297 Kan. 709, 715, 304 P.3d 677 (2013). In its attempt to meet that burden, the State relied on the overlapping entries to argue Watson received payments from Medicaid exceeding that to which he was entitled. But the overlapping entries only establish that Watson submitted false or fraudulent statements for purposes of determining payments. In the absence of any evidence to establish that Watson received money from Medicaid in excess of that which he actually earned, we must vacate the order of restitution.

Affirmed in part and vacated in part.